# UNITED STATES *v.* KNIGHTS

No. 00–1260.   Argued November 6, 2001—Decided December 10, 2001

REHNQUIST, C. J., delivered the opinion for a unanimous Court. SOU-
TER, J., filed a concurring opinion, *post*, p. 122.

*Malcolm L. Stewart* argued the cause for the United
States. With him on the briefs were *Solicitor General
Olson, Assistant Attorney General Chertoff,* and *Deputy
Solicitor General Dreeben.*

*Hilary A. Fox* argued the cause for respondent. With her
on the brief was *Barry J. Portman.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Cali-
fornia by *Bill Lockyer,* Attorney General, *Robert R. Anderson,* Chief As-
sistant Attorney General, *Ronald A. Bass* and *Dane Gillette,* Senior As-

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

A California court sentenced respondent Mark James Knights to summary probation for a drug offense. The probation order included the following condition: that Knights would "[s]ubmit his . . . person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." Knights signed the probation order, which stated immediately above his signature that "I HAVE RECEIVED A COPY, READ AND UNDERSTAND THE ABOVE TERMS AND CONDITIONS OF PROBATION AND AGREE TO ABIDE BY SAME." App. 49. In this case, we decide whether a search pursuant to this probation condition, and supported by reasonable suspicion, satisfied the Fourth Amendment.

Three days after Knights was placed on probation, a Pacific Gas & Electric (PG&E) power transformer and adjacent Pacific Bell telecommunications vault near the Napa County Airport were pried open and set on fire, causing an estimated $1.5 million in damage. Brass padlocks had been removed and a gasoline accelerant had been used to ignite the fire. This incident was the latest in more than 30 recent acts of vandalism against PG&E facilities in Napa County. Suspicion for these acts had long focused on Knights and his friend, Steven Simoneau. The incidents began after PG&E

sistant Attorneys General, and *Laurence K. Sullivan,* Supervising Deputy Attorney General; for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson;* and for the Center for Community Interest by *Andrew N. Vollmer* and *Steven Rosen.*

Briefs of *amici curiae* urging affirmance were filed for the California Public Defenders Association et al. by *Kenneth I. Clayman;* for the National Association of Criminal Defense Lawyers by *John Wesley Hall, Jr.,* and *Lisa B. Kemler;* and for the Rutherford Institute by *James Joseph Lynch, Jr., John W. Whitehead,* and *Steven H. Aden.*

had filed a theft-of-services complaint against Knights and discontinued his electrical service for failure to pay his bill. Detective Todd Hancock of the Napa County Sheriff's Department had noticed that the acts of vandalism coincided with Knights' court appearance dates concerning the theft of PG&E services. And just a week before the arson, a sheriff's deputy had stopped Knights and Simoneau near a PG&E gas line and observed pipes and gasoline in Simoneau's pickup truck.

After the PG&E arson, a sheriff's deputy drove by Knights' residence, where he saw Simoneau's truck parked in front. The deputy felt the hood of the truck. It was warm. Detective Hancock decided to set up surveillance of Knights' apartment. At about 3:10 the next morning, Simoneau exited the apartment carrying three cylindrical items. Detective Hancock believed the items were pipe bombs. Simoneau walked across the street to the bank of the Napa River, and Hancock heard three splashes. Simoneau returned without the cylinders and drove away in his truck. Simoneau then stopped in a driveway, parked, and left the area. Detective Hancock entered the driveway and observed a number of suspicious objects in the truck: a Molotov cocktail and explosive materials, a gasoline can, and two brass padlocks that fit the description of those removed from the PG&E transformer vault.

After viewing the objects in Simoneau's truck, Detective Hancock decided to conduct a search of Knights' apartment. Detective Hancock was aware of the search condition in Knights' probation order and thus believed that a warrant was not necessary.[1] The search revealed a detonation cord, ammunition, liquid chemicals, instruction manuals on chemistry and electrical circuitry, bolt cutters, telephone pole-climbing spurs, drug paraphernalia, and a brass padlock stamped "PG&E."

---

[1] Hancock had seen a copy of the probation order when he was checking Knights' file in the Sheriff's Department office.

Knights was arrested, and a federal grand jury subsequently indicted him for conspiracy to commit arson, for possession of an unregistered destructive device, and for being a felon in possession of ammunition. Knights moved to suppress the evidence obtained during the search of his apartment. The District Court held that Detective Hancock had "reasonable suspicion" to believe that Knights was involved with incendiary materials. App. to Pet. for Cert. 30a. The District Court nonetheless granted the motion to suppress on the ground that the search was for "investigatory" rather than "probationary" purposes. The Court of Appeals for the Ninth Circuit affirmed. 219 F. 3d 1138 (2000). The Court of Appeals relied on its earlier decisions holding that the search condition in Knights' probation order "must be seen as limited to probation searches, and must stop short of investigation searches." *Id.*, at 1142–1143 (citing *United States* v. *Ooley*, 116 F. 3d 370, 371 (CA9 1997)).

The Supreme Court of California has rejected this distinction and upheld searches pursuant to the California probation condition "whether the purpose of the search is to monitor the probationer or to serve some other law enforcement purpose." *People* v. *Woods*, 21 Cal. 4th 668, 681, 981 P. 2d 1019, 1027 (1999), cert. denied, 529 U. S. 1023 (2000). We granted certiorari, 532 U. S. 1018 (2001), to assess the constitutionality of searches made pursuant to this common California probation condition.

Certainly nothing in the condition of probation suggests that it was confined to searches bearing upon probationary status and nothing more. The search condition provides that Knights will submit to a search "by any probation officer or law enforcement officer" and does not mention anything about purpose. App. 49. The question then is whether the Fourth Amendment limits searches pursuant to this probation condition to those with a "probationary" purpose.

Knights argues that this limitation follows from our decision in *Griffin* v. *Wisconsin*, 483 U. S. 868 (1987). Brief for Respondent 14. In *Griffin*, we upheld a search of a probationer conducted pursuant to a Wisconsin regulation permitting "any probation officer to search a probationer's home without a warrant as long as his supervisor approves and as long as there are 'reasonable grounds' to believe the presence of contraband," 483 U. S., at 870–871. The Wisconsin regulation that authorized the search was not an express condition of Griffin's probation; in fact, the regulation was not even promulgated at the time of Griffin's sentence.[2] The regulation applied to all Wisconsin probationers, with no need for a judge to make an individualized determination that the probationer's conviction justified the need for warrantless searches. We held that a State's operation of its probation system presented a "special need" for the "exercise of supervision to assure that [probation] restrictions are in fact observed." *Id.*, at 875. That special need for supervision justified the Wisconsin regulation and the search pursuant to the regulation was thus reasonable. *Id.*, at 875–880.

In Knights' view, apparently shared by the Court of Appeals, a warrantless search of a probationer satisfies the Fourth Amendment only if it is just like the search at issue in *Griffin*—i. e., a "special needs" search conducted by a probation officer monitoring whether the probationer is complying with probation restrictions. This dubious logic—that an opinion upholding the constitutionality of a particular search implicitly holds unconstitutional any search that is not like it—runs contrary to *Griffin's* express statement that its "special needs" holding made it "unnecessary to consider whether" warrantless searches of probationers were other-

---

[2] Griffin was placed on probation in September 1980, 483 U. S., at 870, and the regulation was not promulgated until December 1981, *id.*, at 871.

wise reasonable within the meaning of the Fourth Amendment.[3]  *Id.,* at 878, 880.

We now consider that question in assessing the constitutionality of the search of Knights' apartment. The Government, advocating the approach of the Supreme Court of California, see *Woods, supra,* contends that the search satisfied the Fourth Amendment under the "consent" rationale of cases such as *Zap* v. *United States,* 328 U. S. 624 (1946), and *Schneckloth* v. *Bustamonte,* 412 U. S. 218 (1973). In the Government's view, Knights' acceptance of the search condition was voluntary because he had the option of rejecting probation and going to prison instead, which the Government argues is analogous to the voluntary decision defendants often make to waive their right to a trial and accept a plea bargain.[4]

We need not decide whether Knights' acceptance of the search condition constituted consent in the *Schneckloth* sense of a complete waiver of his Fourth Amendment rights, however, because we conclude that the search of Knights was reasonable under our general Fourth Amendment approach of "examining the totality of the circumstances," *Ohio* v. *Robinette,* 519 U. S. 33, 39 (1996), with the probation search condition being a salient circumstance.

The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined "by

_____

[3] The Wisconsin Supreme Court had held in *Griffin* that "probation diminishes a probationer's reasonable expectation of privacy—so that a probation officer may, consistent with the Fourth Amendment, search a probationer's home without a warrant, and with only 'reasonable grounds' (not probable cause) to believe that contraband is present." *Id.,* at 872.

[4] The Government sees our unconstitutional conditions doctrine as a limitation on what a probationer may validly consent to in a probation order. The Government argues that the search condition is not an unconstitutional condition because waiver of Fourth Amendment rights "directly furthers the State's interest in the effective administration of its probation system." Brief for United States 22.

assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming* v. *Houghton*, 526 U. S. 295, 300 (1999). Knights' status as a probationer subject to a search condition informs both sides of that balance. "Probation, like incarceration, is 'a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty.'" *Griffin, supra,* at 874 (quoting G. Killinger, H. Kerper, & P. Cromwell, Probation and Parole in the Criminal Justice System 14 (1976)). Probation is "one point . . . on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service." 483 U. S., at 874. Inherent in the very nature of probation is that probationers "do not enjoy 'the absolute liberty to which every citizen is entitled.'" *Ibid.* (quoting *Morrissey* v. *Brewer*, 408 U. S. 471, 480 (1972)). Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens.

The judge who sentenced Knights to probation determined that it was necessary to condition the probation on Knights' acceptance of the search provision. It was reasonable to conclude that the search condition would further the two primary goals of probation—rehabilitation and protecting society from future criminal violations.[5] The probation order clearly expressed the search condition and Knights was unambiguously informed of it. The probation condition

---

[5] Under California law, a probation condition is invalid if it (1) has no relationship to the crime of which defendant was convicted; (2) relates to conduct which in itself is not criminal; and (3) requires or forbids conduct which is not reasonably related to future criminality. *People* v. *Lent*, 15 Cal. 3d 481, 485–486, 541 P. 2d 545, 548 (1975).

thus significantly diminished Knights' reasonable expectation of privacy.[6]

In assessing the governmental interest side of the balance, it must be remembered that "the very assumption of the institution of probation" is that the probationer "is more likely than the ordinary citizen to violate the law." *Griffin*, 483 U. S., at 880. The recidivism rate of probationers is significantly higher than the general crime rate. See U. S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics, Recidivism of Felons on Probation, 1986–89, pp. 1, 6 (Feb. 1992) (reporting that 43% of 79,000 felons placed on probation in 17 States were rearrested for a felony within three years while still on probation); U. S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics, Probation and Parole Violators in State Prison, 1991, p. 3 (Aug. 1995) (stating that in 1991, 23% of state prisoners were probation violators). And probationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because probationers are aware that they may be subject to supervision and face revocation of probation, and possible incarceration, in proceedings in which the trial rights of a jury and proof beyond a reasonable doubt, among other things, do not apply, see *Minnesota* v. *Murphy*, 465 U. S. 420, 435, n. 7 (1984) ("[T]here is no right to a jury trial before probation may be revoked"); 18 U. S. C. § 3583(e).

The State has a dual concern with a probationer. On the one hand is the hope that he will successfully complete pro-

---

[6] We do not decide whether the probation condition so diminished, or completely eliminated, Knights' reasonable expectation of privacy (or constituted consent, see *supra*, at 118) that a search by a law enforcement officer without any individualized suspicion would have satisfied the reasonableness requirement of the Fourth Amendment. The terms of the probation condition permit such a search, but we need not address the constitutionality of a suspicionless search because the search in this case was supported by reasonable suspicion.

bation and be integrated back into the community. On the other is the concern, quite justified, that he will be more likely to engage in criminal conduct than an ordinary member of the community. The view of the Court of Appeals in this case would require the State to shut its eyes to the latter concern and concentrate only on the former. But we hold that the Fourth Amendment does not put the State to such a choice. Its interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen.

We hold that the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house. The degree of individualized suspicion required of a search is a determination of when there is a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable. See *United States* v. *Cortez,* 449 U. S. 411, 418 (1981) (individualized suspicion deals "with probabilities"). Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term "probable cause," a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable. See, *e. g., Terry* v. *Ohio,* 392 U. S. 1 (1968); *United States* v. *Brignoni-Ponce,* 422 U. S. 873 (1975). Those interests warrant a lesser than probable-cause standard here. When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable.

The same circumstances that lead us to conclude that reasonable suspicion is constitutionally sufficient also render a warrant requirement unnecessary. See *Illinois* v. *McArthur,* 531 U. S. 326, 330 (2001) (noting that general

or individual circumstances, including "diminished expectations of privacy," may justify an exception to the warrant requirement).

Because our holding rests on ordinary Fourth Amendment analysis that considers all the circumstances of a search, there is no basis for examining official purpose. With the limited exception of some special needs and administrative search cases, see *Indianapolis* v. *Edmond*, 531 U. S. 32, 45 (2000), "we have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers." *Whren* v. *United States*, 517 U. S. 806, 813 (1996).

The District Court found, and Knights concedes, that the search in this case was supported by reasonable suspicion. We therefore hold that the warrantless search of Knights, supported by reasonable suspicion and authorized by a condition of probation, was reasonable within the meaning of the Fourth Amendment. The judgment of the Court of Appeals is reversed, and the cause is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SOUTER, concurring.

As this case was originally presented to us, the dispute centered on whether Knights's agreement to the search condition included in his terms of probation covered only those searches with a probation-related purpose, or rather extended to searches with an investigatory or law-enforcement purpose. At that time, the Government argued that *Whren* v. *United States*, 517 U. S. 806 (1996), precluded any enquiry into the motives of the individual officers conducting the search. We now hold that law-enforcement searches of probationers who have been informed of a search condition are permissible upon individualized suspicion of criminal behavior committed during the probationary period, thus removing any issue of the subjective intention of the investi-

gating officers from the case. I would therefore reserve the question whether *Whren's* holding, that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis," *id.,* at 813, should extend to searches based only upon reasonable suspicion.